Filed 11/16/21  P. v. Ronduen CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LIGAYA RONDUEN,<br><br>    Defendant and Appellant. | B310292<br><br>(Los Angeles County<br>  Super. Ct. No. GA094330) |

APPEAL from an order of the Superior Court of Los Angeles County, Suzette Clover, Judge.  Affirmed.

Sabrina R. Damast, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Kathy S. Pomerantz, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Ligaya Ronduen appeals from the trial court's order denying her motion under Penal Code[1] section 1473.7 to vacate her 2015 conviction of one count of lewd act upon a child. Ronduen, who faces mandatory deportation to the Philippines, contends she did not meaningfully understand the immigration consequences of her no contest plea because her attorney did not fully advise her of the immigration consequences, including mandatory detention and permanent exclusion from the United States, and her attorney's advisement was ambiguous. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      *Ronduen's Plea and Conviction of Lewd Act upon a Minor*

Ronduen was born in the Philippines, emigrated to the United States in 1996, and was granted lawful permanent resident status in 1998. Ronduen has two children who are United States citizens.

On August 21, 2014 Ronduen was charged with three counts of committing a lewd act upon a child under the age of 14 years (§ 288, subd. (a)) and one count of oral copulation with a child under the age of 14 years (§ 288a, subd. (c)(1)). According to the probation officer's report, Ronduen became involved in an online relationship with a purported couple, Brad and Amy, and Ronduen performed sex acts with her then-eight-year-old son on a webcam for the couple. Ronduen later learned the purported couple was actually Hank Andrusick, who she claimed manipulated and tried to blackmail her. In 2011 Ronduen told

_____

[1]      All undesignated statutory references are to the Penal Code.

2

FBI investigators that she and her son had appeared naked on a webcam on seven occasions, during which they engaged in mutual genital touching. In Internet communications with Andrusick recovered by the FBI, Ronduen told Andrusick her son had performed oral sex on her. In June 2011 the Los Angeles County Department of Children and Family Services filed a dependency petition on behalf of Ronduen's two children, and in its investigative report the Department alleged Ronduen exposed her children to her naked body daily, showered with them, and sexually abused her eight-year-old son in front of her 13-year-old son.

On January 21, 2015, pursuant to a negotiated plea agreement, Ronduen pleaded no contest to one count of committing a lewd act upon a child (§ 288, subd. (a)) and was sentenced to the middle term of six years in state prison, among other terms. At the outset of the hearing, the trial court[2] inquired, "Do you need any more time to speak with your attorney at this time before we go forward?" Ronduen responded, "No, your Honor." The court added, "If any other questions come up, please let us know . . . ." The court then recited the terms of the agreement, and Ronduen stated she understood. Ronduen's attorney, Sharon Babakhan, requested time to talk with Ronduen, and the court called another matter while Ronduen and Babakhan conferred. Babakhan then stated Ronduen was ready to proceed. The court responded, "I don't want to rush her" and inquired of Ronduen, "Are you sure that you're ready to go forward at this time?" Ronduen answered "Yes."

The prosecutor represented that Ronduen faced a maximum of 14 years in state prison on the charges, and "there

---

[2]     Judge Elaine Lu presided over the 2015 plea hearing.

3

were even more charges that could have been added after [the] preliminary hearing." Babakhan concurred with the prosecutor's statement. The court advised Ronduen that if she were convicted on all counts and all enhancements were found true, she faced a maximum sentence of 14 years in prison, and Ronduen affirmed that she understood. The court advised Ronduen as to the consequences of her plea, "If you are not a United States citizen, your no contest plea will cause you to be deported, removed, excluded from admission to the United States, denied re-entry, denied naturalization, and denied amnesty." The court asked Ronduen if she understood, and she responded, "Yes."

After further advisements, the trial court asked Ronduen, "[D]o you understand everything I have told you so far about the consequences of your plea?" Ronduen said, "Yes." She also confirmed she had discussed all the consequences with her attorney, and she did not have any questions. The court advised Ronduen of her constitutional and statutory rights, and Ronduen stated she understood and waived her rights. In response to the court's further inquiry, she stated she did not need more time to speak with her attorney before entering her plea.

Ronduen entered a plea of no contest, and Babakhan joined in the waivers of Ronduen's constitutional rights, concurred in the plea, and stipulated to a factual basis based on the arrest report. The trial court found Ronduen's waivers and plea were voluntary, knowing, and intelligent, and there was a factual basis for the plea. The court found Ronduen guilty and, pursuant to the negotiated plea, sentenced her to six years in state prison, entered a 10-year criminal protective order requiring she not have physical contact with her children, and ordered lifetime sex offender registration and victim restitution.

B.     *Ronduen's Motion To Vacate Conviction*

After completing her sentence in state prison, Ronduen was transferred to the custody of the Department of Homeland Security, which commenced deportation proceedings.  On May 1, 2020 an immigration judge ordered Ronduen removed to the Philippines.[3]

On August 21, 2020 Ronduen filed a motion to vacate conviction under section 1473.7.[4]  Ronduen argued that Babakhan failed to advise her of the specific consequences of her plea:  "[Ronduen] was not ever advised, and she did not understand that her plea would result in the rescission of her [lawful permanent resident] status and deportation as an 'aggravated felon'"[5]  In her declaration in support of the motion to

---

[3]     As of the date of Ronduen's motion to vacate her conviction, her appeal to the Board of Immigration Appeals was pending.

[4]     In her motion to vacate her conviction, Ronduen stated her motion was also based on section 1016.5.  This section requires the vacation of judgment and withdrawal of a plea where the trial court failed to provide the advisement, "If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." (§ 1016.5, subds. (a) & (b).)  However, Ronduen did not assert any defect in the trial court's advisement in her motion, and on appeal she does not argue any error under section 1016.5.

[5]     The parties do not dispute that a conviction for a violation of section 288, subdivision (a), is an "aggravated felony" that makes Ronduen deportable and ineligible for relief from deportation.  (See 8 U.S.C. § 1227(a)(2)(A)(iii) [conviction of an aggravated felony grounds for deportation]; 8 U.S.C.

vacate, Ronduen averred that Babakhan visited her only once while in jail, and after that, Babakhan only spoke with Ronduen at the plea hearing. Ronduen was scared and confused, and Babakhan told her that she needed to trust Babakhan's advice to accept the plea because if Ronduen tried to fight the case, she could go to prison for up to 14 years. Babakhan helped Ronduen to understand non-immigration aspects of her sentence, but Babakhan "never told [Ronduen] that [her] conviction is an 'aggravated felony' and a 'crime involving moral turpitude' under immigration law." Babakhan "did not explain to [Ronduen] that this conviction makes [her] mandatorily deportable and ineligible for the most common forms of relief from deportation." Ronduen believed she would "actually be released and allowed to rebuild [her] life in the U.S.," and she "was not aware that [she] would be transferred directly to immigration custody, automatically denied bail under immigration law based on this conviction, and mandatorily detained while fighting [her] immigration case." Ronduen stated that if she had been "told of the real immigration consequences before agreeing to enter a plea," she would have requested time to consult with an immigration attorney and "would have presented these immigration consequences to the prosecution to seek a plea bargain without immigration consequences." Ronduen believed she could have received a better outcome by negotiating "an immigration-safe plea," and if not, she would have gone to trial rather than face permanent

§ 1227(a)(2)(E) [conviction of sexual abuse of a child grounds for deportation]; 8 U.S.C. § 1229b(a) [removal of permanent resident may be canceled where the resident has not been convicted of an aggravated felony].)

exclusion. Ronduen would have "tried all that [she] could" to remain in the United States with her sons and family.

In opposition to the motion, the People argued that the transcript of the plea hearing showed that Ronduen was given multiple opportunities to consult with Babakhan regarding her plea and did so, and multiple times the trial court asked if Ronduen was prepared to proceed with the plea. The court expressly advised Ronduen of the immigration consequences, including deportation and exclusion from the United States, and Ronduen stated without any hesitation that she understood and had consulted with her attorney. Ronduen faced a maximum sentence of 14 years on the charged offenses, and the prosecutor and Babakhan both acknowledged at the hearing that Ronduen faced the possibility of additional charges if the case proceeded to a preliminary hearing. Under these circumstances, the People argued, Ronduen's statement that she would not have pleaded no contest to anything other than a nondeportable offense was not credible.

At the November 10, 2020 hearing on the motion to vacate, Babakhan testified as to her representation of Ronduen in connection with the 2015 negotiated plea.[6] Babakhan stated she met with Ronduen on two or three occasions where Ronduen was jailed. Babakhan also talked with Ronduen several times in "lock-up" or an attorney room when Ronduen came to court for hearings. The prosecutor's original plea offer had been for a

---

[6] Judge Suzette Clover presided over the hearing on Ronduen's motion to vacate. At the hearing, Ronduen's attorney, Robert Jacobs, agreed with the trial court that Ronduen had waived her attorney-client privilege by placing her attorney communications at issue in the motion to vacate.

7

sentence in the double digits, but the prosecutor agreed to lower the offer to six years in state prison after Babakhan retained a forensic psychologist who opined that Ronduen had been suffering from severe depressive disorder that made her highly vulnerable to exploitation. Babakhan was aware from the beginning of the representation that Ronduen was not a citizen of the United States, and Babakhan consulted with a friend who was an immigration attorney and determined "288s are never safe for immigration purposes." Babakhan "explained to [Ronduen] and specifically told her there is no 'but' and 'if' and that she will be deported because of the charges." Babakhan discussed the plea and its deportation consequences with Ronduen on at least two occasions prior to the plea hearing, and Ronduen's assertion that she first heard of the six-year offer on the date of the hearing was false.

Ronduen asked Babakhan how much time there would be after finishing her sentence before she was deported and "does she have time to fight it," and Babakhan said she did not know. Babakhan consulted the husband of Ronduen's sister, who worked for the California Department of Corrections and Rehabilitation, and Babakhan informed Ronduen, "It's not overnight, and she will have time to hire an immigration attorney and fight her case." Babakhan added, "But I told her she'd be deported, no question." Asked if Babakhan ever represented to Ronduen that she could prevail if she tried to fight the deportation, Babakhan answered, "I am not an immigration attorney. I would never make that representation to her."

Ronduen was extremely emotional during the plea hearing, and they had to stop several times while the court and the prosecutor were talking. But Ronduen never indicated she did not want to proceed with the plea or that she would prefer to

8

proceed to trial if the plea would lead to deportation. Asked if Ronduen ever made "any comments or statements to you indicating that avoiding deportation was her priority, no matter how much the sentence was reduced in the People's offer," Babakhan answered "No."

On cross-examination, Babakhan testified she suggested an alternative plea for a four-year sentence to the prosecutor, and the prosecutor responded there was "absolutely . . . no way we're going to agree to anything different" from a conviction under section 288. Babakhan did not make a counteroffer with an immigration-safe plea because "[t]hey were not amenable to that. The D.A. told me they would not consider it." "The option was to go to the prelim and risk higher prison time or take the deal. . . . I put the option in front of [Ronduen] and asked what she wanted to do. She decided. And she wanted the offer." Asked to admit she did not discuss the immigration consequences of the plea with Ronduen on the day of the hearing, Babakhan disagreed, testifying, "I did. We went over everything." Asked what advice Babakhan gave Ronduen regarding what would happen after Ronduen completed her sentence, Babakhan testified, "I did not give her advice. I said she'll be done with the sentence. She's not going to be free. She will be picked up by immigration, and she will go to immigration custody, and she can fight the case by hiring an immigration attorney. And that's exactly what happened."

After hearing argument from counsel, the trial court denied Ronduen's motion. The court concluded, "It seems to me that the evidence established that [Ronduen], in fact, did understand what was happening; that she was upset with what was happening. . . . [¶] . . . [T]here is no requirement that an immigration attorney actually talk to a defendant. Miss

9

Babakhan indicated she had consulted with an immigration attorney, and the immigration attorney gave her correct advice. She passed that advice on.  And it seems to me that counsel met the requirements and that Miss Ronduen was correctly advised. And frankly, there is little chance of not only an immigration-safe plea but a considerable chance of additional charges being made."

Ronduen timely appealed.

## DISCUSSION

A.  *Governing Law and Standard of Review*

Section 1473.7, subdivision (a)(1), provides that a person who is no longer in criminal custody may file a motion to vacate a conviction or sentence on the basis "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere.  A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel."[7]  (See *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 305, 308, 310; *People v. Rodriguez* (2021) 60

---

[7]     Assembly Bill No. 1258 (2021-2022 Reg. Sess.) amended section 1473.7, subdivision (a)(1), effective January 1, 2022, to expand relief to include vacation of a sentence.  (Stats. 2021, ch. 420, § 1.)  The amended section provides as to the basis for a motion to vacate, "The conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of *a conviction or sentence*." (Italics added.)  The amendment is not at issue here.

10

Cal.App.5th 995, 1002.) "A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a *prejudicial* error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea." (*People v. Vivar* (2021) 11 Cal.5th 510, 517 (*Vivar*); see § 1473.7, subd. (e)(1) ["The court shall grant the motion to vacate the conviction or sentence if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a)."].)

"What someone seeking to withdraw a plea under section 1473.7 must show is more than merely an error 'damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences' of the plea. [Citation.] The error must also be 'prejudicial.'" (*Vivar, supra*, 11 Cal.5th at p. 528.) "[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar*, at p. 529; accord, *People v. Rodriguez, supra*, 60 Cal.App.5th at p. 1003 ["A defendant requesting relief under section 1473.7 bears the burden of establishing by a preponderance of evidence that there is a reasonable probability that he or she would not have entered into the plea agreement if he or she had meaningfully understood the associated adverse immigration consequences."].) "When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances. [Citation.] Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain,

11

and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar,* at pp. 529-530; accord, *People v. Rodriguez, supra*, 68 Cal.App.5th at pp. 321-322; see *People v. Mejia* (2019) 36 Cal.App.5th 859, 866 ["The key to the statute is the mindset of the defendant . . . at the time the plea was taken."].)

"We review . . . rulings [under section 1473.7] independently." (*Vivar, supra*, 11 Cal.5th at p. 524; accord, *People v. Lopez* (2021) 66 Cal.App.5th 561, 574 ["a motion to withdraw a plea under section 1473.7 is reviewed independently rather than for abuse of discretion"].) "'[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' [Citation.] When courts engage in independent review, they should be mindful that "'[i]ndependent review is not the equivalent of de novo review . . . .'" [Citation.] An appellate court may not simply second-guess factual findings that are based on the trial court's own observations . . . . In section 1473.7 proceedings, appellate courts should . . . give particular deference to factual findings based on the trial court's personal observations of witnesses." (*Vivar*, at pp. 527-528; accord, *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 76 [On independent review, "[w]e accord deference to the trial court's factual determinations if supported by substantial evidence in the record, but exercise our independent judgment in deciding whether the facts demonstrate trial counsel's deficient performance and resulting prejudice to the defendant."].) "Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Vivar*, at p. 528.)

B.    *Ronduen Failed To Meet Her Burden To Show She Did Not Understand the Immigration Consequences of Her Plea*

Ronduen contends Babakhan never explained to her the "full panoply of immigration consequences" from her plea, including that she would face mandatory deportation, be ineligible for any relief given the nature of her offenses, face permanent exclusion, and be subject to mandatory detention after serving her sentence. Ronduen also argues Babakhan's advice concerning deportation was confusing because Babakhan told Ronduen that after serving her sentence she would have time to find an immigration lawyer and fight her case, suggesting she might not be deported. Ronduen's arguments are not persuasive.

There was strong evidence Ronduen was fully advised and understood the immigration consequences of her plea, including certain deportation, ineligibility for relief, permanent exclusion, and immigration detention while she fought her deportation. At the plea hearing, Ronduen confirmed she understood the trial court's immigration advisement she would be deported, excluded from the United States, and denied reentry and relief, and she acknowledged she had discussed the immigration consequences with her attorney. Further, before entering her plea, Ronduen affirmed she did not have any further questions. Babakhan testified she advised Ronduen on at least two occasions prior to the plea hearing that a section 288 conviction is "never safe" and "there is no 'but' and 'if' and that she will be deported because of the charges." Babakhan "went over everything" again on the day of the plea. Babakhan told Ronduen that following her plea, "[s]he's not going to be free. She will be picked up by immigration, and she will go to immigration custody, and she can fight the case by hiring an immigration attorney." Babakhan did

13

not tell Ronduen she could be released from custody—only that deportation was not "overnight, and she will have time to hire an immigration attorney and fight her case."[8]

Ronduen relies on her own declaration to show she did not meaningfully understand the consequences of her plea. Ronduen declared Babakhan "never told me that my conviction is an 'aggravated felony' and a 'crime involving moral turpitude' under immigration law." And she claimed Babakhan never explained that the conviction made her deportation mandatory without the possibility of relief, or that she would be transferred directly to immigration custody and detained "while fighting [her] immigration case." But the trial court, in finding Ronduen "did understand what was happening" at the time she entered her plea, implicitly found Babakhan's testimony (that she went over everything), coupled with the record from the plea hearing, more credible than Ronduen's declaration to the contrary. (See *People v. Tapia* (2018) 26 Cal.App.5th 942, 953 [trial court "implicitly found" defendant's "self-serving declaration" stating he was not told his plea would lead to deportation was not credible where the plea hearing transcript reflected the court's immigration

---

[8] Ronduen's exhibits show she did retain an immigration attorney to challenge her deportation. However, Ronduen did not argue below, and she did not aver in her declaration, that Babakhan's advice that she would have time to hire an attorney to challenge her deportation caused Ronduen to misunderstand the deportation consequences of her plea. Thus, Ronduen forfeited this argument. (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603 ["'issues not raised in the trial court cannot be raised for the first time on appeal'"].) Even absent forfeiture, Ronduen's asserted confusion is inconsistent with Babakhan's testimony as to what she told Ronduen.

advisement followed by a break for defense counsel to verify the immigration consequences, and defense counsel stated in his declaration he advised the defendant during the break of the immigration consequences, including deportation proceedings].) We defer to the trial court's credibility findings. (*Vivar, supra*, 11 Cal.5th at p. 528; *Tapia*, at p. 953.)

While there is no evidence Babakhan specifically discussed whether Ronduen's offenses were "aggravated felonies" and "crimes of moral turpitude," or that Ronduen would be ineligible for relief from deportation, Babakhan made it clear—"no 'but' and "if'"—Ronduen would be deported, "no question." And Ronduen did not request to confer with Babakhan further after the trial court's advisement that Ronduen would be deported and ineligible for relief. (See *People v. Perez* (2018) 19 Cal.App.5th 818, 829-830 ["the record belies [the defendant's] contention that he did not meaningfully understand the immigration consequences of his plea" because "the superior court explicitly informed [the defendant] that if he were to plead guilty, he would be deported from the United States"]; see also *People v. Tapia, supra*, 26 Cal.App.5th at pp. 952-953 ["[a]fter being specifically advised by the trial court his plea would lead to his deportation and denial of readmission to the United States, [the defendant] did not request more time to speak with counsel or further consider the appropriateness of entering a plea," indicating he "had no need for a further conversation" with his trial counsel because counsel had already advised him].)

Finally, Ronduen's assertion she did not know she would be detained after her sentence is contradicted by Babakhan's testimony she told Ronduen she would go directly into immigration custody. Other inconsistencies between Ronduen's declaration and Babakhan's testimony, including Ronduen's

15

assertion she only met with Babakhan once in jail (instead of several times in jail and at court), cast further doubt on Ronduen's credibility.

Ronduen therefore failed to carry her burden to establish by a preponderance of the evidence she did not meaningfully understand the immigration consequences of her plea at the time it was entered, and accordingly the trial court did not err in denying the motion to vacate her conviction.[9] (§ 1473.7, subd. (e)(1); *Vivar, supra*, 11 Cal.5th at p. 517.)

[9] Because we find Ronduen failed to meet her burden to prove by a preponderance of the evidence that she did not meaningfully understand the consequences of her plea, we do not reach Ronduen's contention that had she been properly advised, she would have negotiated an immigration-safe plea or taken her case to trial. However, we note Babakhan testified the prosecutor made clear the People would "'absolutely'" not offer a plea other than to lewd act on a child under section 288, and Ronduen has not presented any argument how she would have obtained a better result at trial given the evidence of her conduct with her son (including recovered Internet communications with Andrusick and her admissions to FBI investigators).

16

## DISPOSITION

The order denying Ronduen's motion to vacate her conviction is affirmed.

FEUER, J.

We concur:

PERLUSS, P. J.

IBARRA, J.*

---

*        Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.